382 A.2d 173.

HERBERT H. WALKER *vs*. KAISER ALUMINUM & CHEMICAL CORPORATION.

STEVEN MORAN *vs*. KAISER ALUMINUM & CHEMICAL CORPORATION.

LOUIS P. MAISANO *vs*. KAISER ALUMINUM & CHEMICAL CORPORATION.

JANUARY 6, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

582

JOSLIN, J. These three cases involve common issues and were consolidated for argument. In each case the employer, Kaiser Aluminum & Chemical Corporation, appeals from a decree of the full Workmen's Compensation Commission affirming a trial commissioner's decree granting the petition of the employee to enforce the provisions of a preliminary agreement requiring payment of weekly disability benefits. We discuss only *Walker* v. *Kaiser Aluminum & Chemical*

*Corp.,* No. 76-343-Appeal, but what we say with respect to it is dispositive of the other two cases as well.

The facts are not in dispute. On December 4, 1970, Herbert H. Walker, while in Kaiser's employ, sustained a strangulated inguinal hernia and thereafter, on January 19, 1971, entered into a preliminary agreement with Kaiser providing for the payment of $70.33 per week for total disability commencing December 7, 1970. That agreement was approved by the director of labor on January 21, 1971, and the payments provided for therein were made, but only until March 3, 1971. On that date, Walker returned to his former job with Kaiser at a weekly wage at least equal to his average pre-injury earnings. Thereupon, Kaiser, without obtaining approval therefor under any provision of the Workmen's Compensation Act, terminated and has not since resumed payment of the weekly benefits called for by the preliminary agreement.

Except for two brief intervals[1] of disability due to injuries unrelated to the December 1970 hernia, Walker, following his return to work, remained in Kaiser's employ and received full wages until September 15, 1974, when he voluntarily left for causes unrelated to a work-incurred disability. About a year later, on August 18, 1975, he filed this petition to recover the compensation benefits which had accrued since March 3, 1971 under the first preliminary agreement.

---

[1] Walker did not work between October 11, 1973 and February 17, 1974 because of a lumbar spine strain. Although no preliminary agreement was entered into with respect to that injury, Kaiser paid Walker compensation benefits of $1,721.32 during that period.

On May 1, 1974, Walker sustained a compensable injury to his toe. He and Kaiser then entered into a second preliminary agreement pursuant to which he received compensation of $350.08 for 6 weeks of partial incapacity. Further payments under that agreement were discontinued pursuant to a suspension agreement and receipt which was approved by the director of labor. Those agreements clearly stated they were applicable only to the May 1, 1974 toe injury.

A trial commissioner adjudged Kaiser in contempt for non-compliance with the preliminary agreement and ruled that it could purge itself by paying Walker the amount in default. Kaiser appealed to the full commission, which affirmed, and it now appeals to this court.

The nub of the case is whether Walker, by reason of his voluntary return to full-time work as a Kaiser employee at a weekly wage at least equal to his average pre-injury weekly wage, freed Kaiser in whole or in part from its obligation to pay weekly benefits under the first preliminary agreement.

Kaiser contends that the primary purpose of weekly benefits under the Act is to provide an economic substitute for the salary an employee would have received if he had not lost his earning capacity as a result of a work-related injury. Thus, to permit Walker to recover weekly compensation, notwithstanding the wages he received following his return to work, would compensate him even though his earning capacity was no longer impaired. The payment of benefits plus wages, Kaiser concludes, would completely frustrate the purpose of the Act.

The principle that compensation is paid only for a loss of earning capacity is one that has been deeply imbedded in our compensation law since *Weber* v. *American Silk Spinning Co.*, 38, R.I. 309, 95 A. 603, was decided in 1915. Notwithstanding that principle, an employee's voluntary return to work, though it may spell a reduction in, or the end of, any impairment of his earning capacity, does not under our practice entitle his employer unilaterally to modify or terminate its continuing obligation to pay weekly benefits under a preliminary agreement, order or decree. Instead, affirmative relief from that obligation on the ground of partial or total recovery of earning capacity can be obtained only by resort to a procedure made available by the Act. *E.g.*, *Raymond* v. *B.I.F. Industries, Inc.*, 112 R.I. 192, 197, 308 A.2d 820, 823 (1973); *Frenier* v. *United Wire & Supply Corp.*, 83 R.I. 472, 477-78, 119 A.2d 724, 727

(1956); *Lichtenstein* v. *Parness,* 81 R.I. 135, 138, 99 A.2d 3, 4-5 (1953); *Brown & Sharpe Manufacturing Co.* v. *Giacoppa,* 69 R.I. 378, 382, 33 A.2d 419, 421 (1943); *Gobeille* v. *Ray's Inc.,* 65 R.I. 207, 213, 14 A.2d 241, 244 (1940); *Carpenter* v. *Globe Indemnity Co.,* 65 R.I. 194, 204-05, 14 A.2d 235, 240 (1940).[2]

Nonetheless, Kaiser complains that it is inequitable that Walker should be entitled to compensation for a period during which he received full wages. The inequity flows, however, not from our enforcement of the Act, but from Kaiser's failure to comply with it. *Brown & Sharpe Manufacturing Co.* v. *Giacoppa,* 69 R.I. at 383, 33 A.2d at 421; *see Plouffe* v. *Taft-Peirce Manufacturing Co.,* 91 R.I. 221, 227, 162 A.2d 557, 560 (1960). If the rule is to be changed, the change must originate with the Legislature, not the courts.

Kaiser also argues, as we understand its position, that an implied agreement to suspend compensation benefits resulted when Walker returned to his former employment, and that this implied agreement is entitled to the same force and effect as would have been accorded a written suspension agreement and receipt, signed both by Walker and by Kaiser, and approved by the director of labor.

Our consideration of that contention, however, raises the preliminary question of whether statutory authority exists for the use of even a duly executed and approved suspension agreement as a means of discontinuing, suspending, or reducing compensation benefits. Unwilling to consider the abbreviated procedure urged by Kaiser without assuring

---

[2]These cases list the following as approved procedures:

(1) a decree or order of the commission following a petition for review pursuant to G.L. 1956 (1968 Reenactment) §28-35-45; (2) approval by the director of labor of a suspension agreement and receipt; (3) authorization from the commission as provided for in §28-35-46 through §28-35-56, inclusive, following a notice from the employer·to both the employee and the commisson of its intention to discontinue, suspend or reduce payments.

ourselves that the underlying practice itself — the suspension agreement procedure — was authorized by the Act, we requested a reargument on that narrow issue. *Walker* v. *Kaiser Aluminum & Chemical Corp.*, 118 R.I. 952, 374 A.2d 812 (1977).

In reargument neither party pointed to any controlling authority on that question, or even to any mention in the Act of the term suspension agreement and receipt, or settlement agreement as it is sometimes called. Walker submits, however, that authority for the procedure is found in §28-35-3.[3] His theory is that the language, "an agreement in regard to compensation," comprehends literally *any* such agreement, including suspension agreements and recepts as well as preliminary agreements.

In our judgment, that construction, although plausible, is questionable. In the first place, there is a significant difference between an agreement initiating compensation and one ending compensation, and a statute such as §28-35-3 that is clearly intended to authorize the former need not necessarily be read as authorizing the latter.

Moreover, §28-35-3 must be read in light of its development and with particular attention to two provisions of P.L. 1912, ch. 831, our original Workmen's Compensation Act. One of those provisions is art. III, §1, which is the precursor to, and in substance is not materially different

---

[3]General Laws 1956 (1968 Reenactment) §28-35-3 reads as follows:
"If an employer or insurer and an employee, or in case of fatal injury his legal representative, shall reach *an agreement in regard to compensation*, such agreement shall be submitted in writing to the director of labor by the employer or insurer with a statement of the time, place and nature of the injury upon which it is based, and if said director of labor shall find such agreement to conform to the provisions of chapters 29 to 38, inclusive, of this title in every regard, he shall so approve it and shall docket the same in a book kept for the purpose. A copy of any such agreement shall be delivered to each of the parties, and thereafter it shall be as binding upon both parties as an award or order by or decree of the workmen's compensation commission." (Emphasis added.)

from, §28-35-3. The other is art. III §14, which in material part provides "that an agreement for compensation may be modified at any time by a subsequent agreement between the parties approved by the superior court * * * ." Comparison of those two provisions leaves little doubt that art. III, §14 was a more likely source of authority for the suspension agreement and receipt procedure than art. III, §1 (now §28-35-3).

In 1954, the Act underwent a major revision (P.L. 1954, ch. 3297, §1) and the portion of art. III, §14, of the earlier Act relating to modification of an agreement by a subsequent agreement was not reenacted. The revision did, however, include in art. III, §12 (now §§28-35-46 through 28-35-53)[4] a new and somewhat different modification procedure. In material portion it prohibits an employer from ending or reducing compensation benefits without first giving written notice of its intention to do so both to the commission and to the employee, and it also provides the employee with a means for disputing the contemplated action. Arguably, this newly established procedure was intended by the Legislature to take the place of the suspension agreement and receipt procedure previously authorized by Art. III, §14.[5]

---

[4]General Laws 1956 (1968 Reenactment) §§28-35-46 through 28-35-53. Section 28-35-46 provides in pertinent part as follows:

"Before an employer may discontinue, suspend or reduce compensation payments whether they are being received under an agreement, award, order, finding or decree, the employer shall notify the commission and the employee of his intention to discontinue, suspend or reduce payments and the reason therefor."

Section 28-35-47 provides a specific procedure for the case where, as here, the employer alleges that the employee has returned to work at a wage equal to or greater than his pre-injury earnings.

[5]*Carpenter* v. *Globe Indemnity Co.*, 65 R.I. 194, 14 A.2d 235 (1940) is the seminal case in this area. Although it holds that a preliminary agreement can be modified by a suspension agreement and receipt, it antedates by 14 years the 1954 revision and thus was decided when the controlling statute specifically provided that an agreement for compensation could be modified by a duly executed and approved suspension agreement.

Notwithstanding these doubts about whether §28-35-3 provides backing for the suspension agreement and receipt procedure, the parties acknowledge its consistent use over an extended period in countless cases for ending or reducing benefits. *E.g., De Berardis* v. *Davol, Inc.,* 112 R.I. 746, 747, 316 A.2d 337, 338 (1974); *Durante* v. *Atlantic Tubing & Rubber Co.,* 110 R.I. 465, 468-69, 294 A.2d 190, 192 (1972); *Trudeau* v. *United States Rubber Co.,* 92 R.I. 328, 331-32, 168 A.2d 460, 462-63 (1961); *Virgilio* v. *United States Rubber Co.,* 85 R.I. 136, 138, 127 A.2d 863, 864 (1956). Moreover, that usage has been approved by the labor department, the commission, the compensation bar, and this court, and §28-35-3 is the only provision now in the Act that can furnish the requisite statutory underpinning.

This long-continued practice, particularly where §28-35-3 is not clearly susceptible to a single meaning, is entitled to great weight in determining the legislative intention. Certainly, the Legislature could not have failed to know what has been occurring over these many years. Yet the Legislature did nothing to indicate that either the practice, or the administrative and judicial approval it has received, runs counter to its intentions. In the circumstances, its failure to take corrective action may be viewed as acquiescence therein. *Trice* v. *City of Cranston,* 110 R.I. 724, 730, 297 A.2d 649, 652 (1972); *Chernov Enterprises, Inc.* v. *Scuncio,* 107 R.I. 439, 443, 268 A.2d 424, 426-27 (1970).

At this late date, therefore, only overwhelming reasons would justify our placing a construction on §28-35-3 different from that sanctioned by such long-standing and universal practice and by the Legislature's acquiescence. Kaiser, however, urges that we further construe that section as authorizing the use, not only of a written suspension agreement and receipt, signed by the parties and approved by the director of labor, but also of an *implied* suspension agreement, unwritten, unsigned and unapproved. This we

cannot do, finding no authority for such a construction, whether by practice, acquiescence, or otherwise.

Apart from its direct challenge to the rule prohibiting unilateral suspension of compensation payable under an agreement or decree, Kaiser makes several other contentions. One is that under the doctrine of *Ottone v. Franklin Process Co.*, 76 R.I. 431, 436-37, 71 A.2d 780, 783 (1950), as applied in *Trudeau v. United States Rubber Co.*, 92 R.I. at 331, 168 A.2d at 462, the execution of a second preliminary agreement fixing compensation for the disabling injury to Walker's toe established its July 1974 execution date as the starting point for determining whether his incapacity had diminished or ended. But the *Ottone* doctrine was interpreted in *Roy v. Great Altlantic & Pacific Tea Co.*, 101 R.I. 53, 58-59, 220 A.2d 512, 516 (1966), where we held that the doctrine would apply only if the later agreement related to the injury that was the subject of the earlier agreement. Here, the 1971 agreement involved a hernia and the 1974 agreement, a toe. Because the two were separate and unrelated injuries, the execution of the second agreement in 1974 did not inhibit the commission from hearing Walker's petition to enforce the earlier agreement. Nothing we said in *Raymond v. B.I.F. Industries, Inc.*, 112 R.I. 192, 308 A.2d 820 (1973), in any way expands the ambit of the *Ottone-Trudeau* doctrine to the facts of this case.

Kaiser also contends that Walker's delay of 4 years and 5 months between the termination of payments and the filing of this petition constitutes laches and bars any recovery. We rejected a similar contention made in comparable circumstances in *Plouffe v. Taft-Peirce Manufacturing Co.*, 91 R.I. 221, 227, 162 A.2d 557, 560 (1960), where we said:

> "However, we do not think that this principle allows an employer to shift to an employee the obligation of seeking a ruling of the commission on the validity of the employer's unilateral determination on the extent of its obligation. Any hardship suffered in such a case is clearly self-imposed and could readily have been ob-

viated by the employer invoking the procedures outlined in G.L. 1956, §28-35-46. A contrary holding would visit an additional procedural burden upon the employee which was not contemplated by the framers of the act and would be inconsistent with the simplicity of the remedy it was designed to achieve."

*Accord, Raymond* v. *B.I.F. Industries, Inc.,* 112 R.I. at 199-200, 308 A.2d at 824. What we said in those cases is dispositive here.

Kaiser further argues that Walker's claim under the 1971 agreement, even if valid, should be barred by an estoppel or an estoppel *in pais.* It bases that claim upon the disadvantage it allegedly suffered because of Walker's unexplained failure to initiate any proceeding to enforce his claim to compensation benefits during the 4 years and 5 months intervening between March 3, 1971 when it terminated payment of those benefits and August 18, 1975 when the "Petition to Enforce Agreement" was filed. In substance, its claim, like that of the employer in *Raymond* v. *B.I.F. Industries, Inc.,* 112 R.I. at 198, 308 A.2d at 824, is that Walker "having remained silent when it was his duty to speak, ought not to be allowed to speak at a time when fair play requires him to remain silent."

But that contention, although it presumes that Walker was under a duty to speak, does not indicate what circumstances imposed that duty. To establish those circumstances was Kaiser's burden. *Id.* at 198, 308 A.2d at 823. Absent such proof, Kaiser's claim rests solely on Walker's silence, and mere silence, unless accompanied by a duty to speak, will not raise an estoppel. *Martines* v. *Terminal Methods, Inc.,* 101 R.I. 599, 601, 225 A.2d 790, 792 (1967).

It is of course true that shortly before the filing of the instant petition a Kaiser employee prepared a suspension agreement and receipt relating to the 1971 agreement and, agreeably to the prevailing company practice, delivered it to the president of Walker's union. The union president, in-

stead of obtaining Walker's signature as Kaiser had anticipated, subsequently gave the agreement to Walker's attorney. Walker's only response was the commencement of this proceeding, with appropriate notice to Kaiser, less than a month later.

We are not prepared to say whether Walker could have remained silent with impunity had the suspension agreement and receipt been delivered to his attorney for signature comtemporaneously with his return to work, rather than 4 years and 4 months later and only about a month prior to the commencement of this proceeding. But that is not this case. To the contrary, in the circumstances here prevailing, the duty to seek relief from the obligation to pay compensation benefits under the 1971 preliminary agreement was Kaiser's, rather than Walker's, and the commission so found. That finding is conclusive in the absence of fraud, and none has been charged. *Raymond* v. *B.I.F. Industries, Inc.*, 112 R.I. at 199, 308 A.2d at 824.

Finally, Kaiser contends that, even if Walker's claim is sustained, Kaiser is entitled to credit for compensation in the amount of $1,721.32 paid to him for the period between October 11, 1973 and February 17, 1974, when he was not working because of a lumbar spine strain. See note 1, *supra*. No new agreement covering these payments was executed, however, and on these facts Kaiser's contention, as equitable as it might appear, is answered bluntly by §28-35-9 of the Act, which mandates that "such employer * * * shall not be entitled to any credit for such payment if the employee is awarded compensation in accordance with" the Act.[6]

---

[6]General Laws 1956 (1968 Reenactment) §28-35-9 reads as follows:

"Payment of compensation without agreement. — In the event that an employer or insurer makes payment or compensation to an employee without executing a memorandum of agreement such payment shall constitute an admission that the employee is entitled to compensation under the provisions of chapters 29 to 38, inclusive, of this title and such employer or insurer shall not be entitled to any credit for such payment if the employee is awarded compensation in accordance with the provisions of said chapters."

The respondent's appeals from the decrees adjudging it in contempt and stipulating the manner in which it may purge itself are denied and dismissed, the decrees appealed from are affirmed, and the cases are remanded to the Workmen's Compensation Commission for further proceedings.

Mr. Justice Paolino did not participate.

*Lovett & Linder, Ltd., Raul L. Lovett* for Herbert H. Walker, petitioner.

*Carroll, Kelly & Murphy, Ambrose W. Carroll, Quinn, Cuzzone & Geremia, Bruce Q, Morin,* for respondent.